# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

CIVIL ACTION NO. 3:12CV-185-JHM

PATTI M. BERRY, et. al.                                                              PLAINTIFFS

VS.

MAKER'S MARK DISTILLERY, INC.                                              DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Maker's Mark Distillery, Inc.'s Motion for Summary Judgment [DN 24] and Motion to Exceed Page Limitations [DN 54]. Fully briefed, these matters are ripe for decision.

## I. BACKGROUND

This case arises out of multiple claims by former and current employees of Defendant Maker's Mark Distillery, Inc. ("Maker's Mark). The plaintiffs in this action include Patti M. Berry (Berry),[1] Courtney R. Clark ("Clark"), Christy L. Fogle ("Fogle"), Bonnie L. Mills ("Mills"), and Mary Thompson ("Thompson") (collectively "Plaintiffs"). On May 16, 2011, Plaintiffs filed EEOC claims against Defendant Maker's Mark. Plaintiffs maintain claims based on (1) hostile work environment; (2) gender discrimination; (3) religious discrimination; and (4) retaliation in violation of Title VII of the Civil rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Kentucky Civil Rights Act, KRS 344.010 *et seq.* (the "KCRA"). Also, Fogle asserts an interference and a retaliation claim under the Family and Medical Leave Act, 29

---

[1] There are two individuals in this case with the surname "Berry," including Plaintiff Patti Berry and another worker at Maker's Mark named Angel Berry. In order to avoid confusion, Patti Berry will only be referred to as "Berry" and Angel Berry will be identified as "Angel Berry."

U.S.C. § 2601 *et seq.* ("FMLA"). Clark, Fogle, Mills, and Thompson remain employed with Maker's Mark. Berry was terminated

## A. Bottling-Line Forklift Rotation

At some point in the latter part of 2010, Dale Miles ("Miles"), bottling line supervisor, and Brian Mattingly ("Mattingly"), Director of Bottling and Warehousing Operations, altered the forklift rotation at the bottling-line facility by switching it from a 30 minute rotation to a weekly rotation job. Prior to the change, employees in the bottling area of Maker's Mark worked 30-minute rotations for each job on the two lines, designated as Line A and Line B. The tasks on each line included dipping bottles, casing the bottles, and operating the forklift. The forklift rotation did not offer additional compensation or benefits. However, Miles and Mattingly took the forklift work out of the 30-minute rotation in order to address employee complaints about not wanting to drive the forklift and to improve efficiency. In order to determine which employees wanted to drive the forklift on the new weekly rotation, Miles posted a sign-up sheet.

Berry and Fogle signed the sheet indicating that they would like to continue to drive the forklift. According to Berry, even though she was qualified to use the forklift and wanted to operate it, Miles would skip over her when it was her turn to operate the forklift. [Berry Dep., DN 49-1, at 6]. Fogle similarly indicated that she was skipped on the weekly rotation. [Fogle Dep., DN 44-1, at 9]. Mills operated the forklift until January of 2010 when she asked to be taken off the rotation due to health issues with a family member. [Mills Dep., DN 24-7, at 16].[2] Thompson decided not to operate the forklift because she felt that she was unfairly harassed while operating it. [Thompson Dep., DN 24-8, at 19]. Clark asked to operate the forklift in 2010,

---

[2] Mills' testimony lacks clarity as to whether she actually asked to be put back on the weekly forklift schedule at some point in 2010. [Mills Dep., 24-7, at 16]. However, after some dialogue concerning whether Mills personally asked to be put back on the list, she responded, "no, I didn't ask no more because I knew it wasn't going to do no good." Id.

but it is not clear if she actually signed the sheet to operate it on the weekly rotation. [Clark Dep., DN 47-1, at 8]. Additionally, Clark first asked to be trained on the forklift in 2012 even though she said that she had expressed interest in the position prior to that time. Id at 9.

**B. The Oliver Group Survey**

Defendant Maker's Mark utilizes an independent company every other year to administer a survey of its employees, excluding supervisors and temporary workers. In October of 2010, Daniel Johnsen ("Johnsen") from the Oliver Group proctored a survey—not taken in the presence of any member of management—during working hours at the Maker's Mark clubhouse. The survey did not provide a line for employees to identify themselves by name, but it did have a place for employees to identify their department and to choose a range of years in which they had been employed with Defendant. The Oliver Group gave Maker's Mark general feedback based on the surveys, but they did not provide the actual surveys to Defendant.

Berry, Thompson, and Mills completed the October survey, but Fogle and Clark did not take part in it. After receiving feedback in the early part of 2011, Maker's Mark invited Johnsen to discuss the survey and to answer any questions that employees had concerning the results of the survey. While there were no members of management present during these meetings held on March 31 and April 1, 2011, Plaintiffs contend that supervisors would have known who attended the meetings since they were held during business hours. Berry and Mills attended these meetings. Although Fogle did not participate in the survey, she attended the meetings. At the meetings, Berry said she spoke about harassment at the workplace and about favoritism. [Berry Dep., DN 49-1, at 15]. Fogle privately met with Johnsen to tell him about the sexual harassment in her work area as well as men and women being treated differently. [Fogle Dep., DN 44-1, at 11-12]. Thompson did not attend the meetings, but she chose to meet with Johnsen privately,

and she informed him of the favoritism at Marker's Mark and the "dirty talk" among employees. [Thompson Dep., DN 48-1, at 13-14]. Clark did not feel comfortable attending the meetings with Johnsen, but she called him and reported sexual harassment. [Clark Dep., DN 47, at 6-7].

After the individual and group meetings with Johnsen, he emailed Donna Lucey ("Lucey"), Victoria MacRae-Samuels, and Rob Samuels a summary of the conversations that he had over those two days. The email contained no specific references to individuals making those statements, but it did identify certain individuals who were discussed during the meetings. [April 5, 2011 Email, DN 21-14, at 2]. As it relates to this case, the summary stated that Kim Hagan, one of Maker's Mark's lead bottling line workers, was "putting people off the line for commenting on the survey" and "telling people that they shouldn't communicate." Id. It also mentioned that Mattingly had told people that "the rules are going to change" which was "taken as a threatening comment." Id. In terms of harassment, the email stated that "harassment of non-friends of supervisors" needed to stop, and that there existed "[s]omewhat of a threatening environment, [and] some racial comments." Id. 1-2.

### C. Kim Hagan's Complaint

On April 11, 2011, Hagan reported to Mattingly two recent issues that she had had with Berry. The first complaint by Hagan arose after she and other employees decided to get fish sandwiches for lunch. According to Hagan, Berry mocked her for not purchasing a sandwich for her and some of the other employees. Additionally, Hagan said that she witnessed Berry perform a suggestive dance for David Wiser ("Wiser"), a coworker, on the smoking deck. Mattingly then called Lucey, Maker's Mark former Human Resources Administrator, who asked Hagan to tell her what she had just told Mattingly about Berry. Lucey also asked if Hagan was aware of any other inappropriate conduct related to Berry. At that point, Hagan informed Lucey that Berry

had exposed her breasts at work on multiple occasions. As a result of Hagan's complaint, Lucey interviewed Sherri Duvall and Stephanie Nally who confirmed that they had both witnessed Berry expose her upper body, but they did not witness the suggestive dance. [Lucey Dep., DN 42-1, at 11].

On the following day, Victoria MacRae-Samuels, Maker's Mark's Plant Manager, and Mattingly discussed with Berry the allegations made against her by Hagan and informed her that she was suspended pending a full investigation into the matters. Over the course of the next two days (April 12 and April 13, 2011), Mattingly, MacRae-Samuels, and Lucey interviewed ten employees, including **Kim Hagan, Sherri Duvall, Stephany Nally, Stacy Beaven, Jill Osborne, Grace Mattingly, David Wiser, and Randy Mattingly,** about Berry's alleged inappropriate conduct. [Lucey Dep., DN 42-1, at 11]. According to deposition testimony from Lucey, five of those ten employees[3] stated that they had witnessed Berry expose her breasts at the facility and three of the witnesses[4] observed Berry perform a suggestive dance for David Wiser. As a result of the investigation, Maker's Mark terminated Berry on April 14, 2011.

### D. Harassment Complaint

On April 23, 2011, Fogle, Thompson, and Mills each sent MacRae-Samuels a formal letter alleging various concerns about the workplace, including unfair treatment dealing with the forklift, inappropriate language used by Hagan, Nally, and Duvall, and difficulty with Miles. Clark submitted a similar complaint on May 4, 2011. All four of the letters included a section that they were submitting the information to MacRae-Samuels in compliance with Defendant's Code of Conduct. Plaintiffs in this case have each attended in-house training concerning sexual

---

[3] Those employees were Kim Hagan, Sherri Duvall, Stephany Nally, Stacy Beaven, Dale Miles, and Randy Mattingly. [Lucey Dep., DN 42-1, at 12].
[4] Those employees were Kim Hagan, Jill Osborne, and Stacy Beaven. [Lucey Dep., DN 42-1, at 12].

harassment[5] in prior years and each has signed the Beam Global Code of Conduct,[6] which addresses reporting of sexual harassment.

In addition to the concerns about inappropriate language, Fogle complained in her letter that Miles failed to post an available forklift position following a vacancy created by Steve Masterson. According to Fogle's letter, Miles gave the forklift position to David Wiser even though he had less seniority than her. Fogle stated in her deposition that Miles told her that a forklift position would be posted in January 2011, but he never posted the job. However, Fogle received a part-time forklift position in June of 2011, which was posted that year. Even though Fogle received the only forklift position posted in 2011, she believes that Miles did not want to have women operating the forklift and hired men outside the normal bidding process. Additionally, she believes that Maker's Mark intentionally created a part-time forklift position, which she received, instead of a full-time position to retaliate against her. [Fogle Dep., DN 44-1, at 5].

As a result of the letters sent to MacRae-Samuels, Lucey interviewed the four individuals concerning the contents of their complaints and informed them that Maker's Mark would conduct an investigation into their allegations. Lucey then spoke to Hagan, Miles, Duvall, Nally, and Kathy Jones. Based on these interviews, Lucey found that sexual discussions were "pretty prevalent" at the workplace and that many employees in the bottling area used this type of language. [Lucey Dep., DN 43-1, at 3]. Maker's Mark did not discipline those individuals accused of having sexual discussions at the workplace, but they were told that they should no longer engage in such conversation while at work. Defendant also responded to these complaints

---

[5] "The training sessions have been held on June 26, 2000; August 2, 2002; August 17, 2004; September 19, 2006; September 24, 2008; and, May 3, 2011." [Lucey Aff., DN 24-18, at 2].
[6] "[E]ach employee has received and signed a Beam Global Code of Conduct (signed in 2006 or upon date of hire if hired after January 1, 2006), and a refresher was given in April 2010. The Code of Conduct contains information on reporting harassment." [Lucey Aff., DN 24-18, at 3].

by conducting sexual harassment training at its Loretto facility. Mills, Thompson, Clark, and Fogle all agreed during their respective depositions that the use of inappropriate language, for the most part, ended following the investigation. Lucey also interviewed Miles concerning the forklift rotation and he informed her every person on the rotation list was given equal opportunity to drive the forklift. There was no action taken by Maker's Mark regarding concerns about the forklift rotation.

### E. "No Retaliation" Notice

On May 12, 2011, MacRae-Samuels and Mattingly met with Fogle, Mills, Thompson, and Clark, individually, regarding complaints that they had retaliated against other employees. According to MacRae-Samuels, the complaints came from Duvall and Nally on the morning of May 12. [MacRae-Samuels, DN 53-1, at 8]. Plaintiffs (except Berry) were each provided a "NO RETALIATIION NOTICE" on that day. Each notice documented multiple instances of alleged retaliation by Fogle, Mills, Thompson, and Clark. On the following day, MacRae-Samuels and Bob Priest, a corporate representative, met with Thompson, Mills, and Clark concerning potentially more perceived retaliatory behavior directed at Duvall, which allegedly took place after the meeting on the previous day.

### F. Promotion Claims: Fogle and Clark

Fogle applied for a Bourbon Specialist (tour guide) position in November of 2011 at Maker's Mark and did not receive a job in that department. She also applied for the Management Systems and Safety Specialist position in June of 2012, but she did not receive that position either. Fogle believes that Maker's Mark hired other individuals instead of her in order to retaliate against her.

In October of 2011, Clark, a part-time employee at the time, applied for three full-time positions, two guard openings and a distillery job. As a result of these job postings, six part-time

employees, including Clark, Angel Berry, Kevin Gardner, Johnny Johnson, Roxana Norris, and Chris Spalding, applied for the distillery position and five part-time employees, including Clark, Gardner, Johnson, Norris, and Spalding, sought the guard positions. Defendant decided to interview all six applicants on October 14, 2011 for the three positions that were available. Mattingly, Greg Davis, and Johnny Osborne conducted the actual interviews.

During the interviews for the positions, the applicants were asked whether they preferred a guard position or a distillery position. Of those individuals who interviewed, only Chris Spalding and Johnny Johnson indicated that they sought the guard positions. Additionally, for those individuals who wanted the distillery position, Norris and Angel Berry were the only individuals who actually went to go talk to distillery operators about the positions after their normal shift at Maker's Mark. Following the interviews, Maker's Mark hired Chris Spalding and Johnny Johnson for the two guard positions and hired Norris for the distillery position.

On October 26, 2011, Maker's Mark offered another position in the distillery. Clark also applied for that position, but Defendant hired Angel Berry. Clark believes that Maker's Mark chose not to hire her for these positions because of her sex and in retaliation for filing a Charge of Discrimination with the EEOC.

### G. Fogle's FMLA

Fogle started leave under the Family Medical Leave Act ("FMLA") in October of 2011. Although the record reflects a lack of clarity as to a start and end date for Fogle's FMLA leave period, Maker's Mark contends that Fogle started her FMLA on October 11, 2011 and exhausted her leave by January 2, 2012. [Lucey Aff., DN 24-18, at 3]. Fogle appears to have received conflicting documents concerning her FMLA leave with the last document indicating a leave period extending from November 22, 2011 to January 11, 2012. [Fogle Dep., DN 44-1, at 29]. In contrast, Fogle contends that her FMLA leave did not end until February 16, 2012, and that

Maker's Mark told her on February 16 not to return to work until February 20. Then, on February 20, MacRae-Samuels told Fogle that she was a day early in returning to work and that she needed to come back the next day. Id. at 28.

Upon returning to work on February 21, Fogle was told that she was going to be moved from her part-time forklift position to a part-time bottling-line job. Defendant informed her that they moved her to the bottling-line because of her absences prior to her taking FMLA leave. Although Fogle's move to the bottling-line did not affect her pay, she maintains that it impacted her seniority. Due to this change in seniority, Fogle asserts that an employee with less seniority than her was able to go home one day while she was required to stay and work. Fogle believes that she should have been given the option to stay or not because that is one of the advantages of having seniority. [Fogle Dep., DN 45-1, at 12]. However, when asked about this situation, Fogle could not actually recount a specific time that this happened.

### H. Fogle's Written Warning

Even though Fogle returned to bottling-line work in February of 2012, she continued to operate the forklift on the weekly rotation. Fogle received a written warning for her performance using the forklift in March of 2012. The actual write-up did not occur until May, but Mattingly talked to Fogle concerning complaints made about her work on April 10, 2012. When asked whether this write-up related to her claims in this case, Fogle responded that they were not and that the issues were union related.

## II. SUMMARY JUDGMENT

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the

basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.  It is against this standard the Court reviews the following facts.

## III.  ANALYSIS

### A.  Gender Discrimination

Under Title VII, it is "unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2.[7]  A plaintiff may pursue a claim for sex discrimination through either direct or circumstantial evidence.  White v. Columbus Metropolitan Housing Authority, 429 F.3d 232, 238 (6th Cir. 2005).  In this case, Plaintiffs rely on a circumstantial

---

[7] Because the KCRA tracks the language of Title VII, Kentucky courts look to federal case law in interpreting the KCRA. Ky. Comm'n on Human Rights v. Ky. Dep't for Human Resources, 564 S.W.2d 38 (Ky. Ct. App. 1978).

evidence to establish their case as to sex discrimination, and therefore, the Court must apply the framework utilized in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). <u>See</u> <u>White</u>, 533 F.3d at 400.

To establish a prima facie case for sex discrimination, a plaintiff must demonstrate: "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated male and/or nonminority employees for the same or similar conduct." <u>McClain v. NorthWest Community Corrections Center Judicial Corrections Bd.</u>, 440 F.3d 320, 332 (6th Cir. 2006). If a plaintiff can establish these elements, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for taking the adverse employment action. <u>See</u> <u>Id</u>. Assuming the defendant can provide a legitimate, nondiscriminatory reason, the plaintiff then has the burden to show that the defendant's stated reason was merely pretextual.

### 1. Forklift Rotation

Plaintiffs assert that Maker's Mark discriminated against them based on their sex in violation of Title VII and the KCRA by not allowing them to operate the forklift in the weekly rotation. As to this particular theory, Berry, Fogle, and Clark are the only plaintiffs in this action who have alleged issues with the forklift rotation.[8] Berry and Fogle were on the weekly forklift rotation, but they contend that Miles would continuously skip over them when it was their turn to drive the forklift. Clark did not sign the sheet to operate the forklift, but she testified that she asked Miles to be put on the list in 2010. Plaintiffs have articulated claims for sex discrimination under both a "single-motive" theory, "where an illegitimate reason motivate[s] an employment decision," and "mixed-motive" theory, "where both legitimate and illegitimate reasons

---

[8] Thompson and Mills asked to be taken off of the forklift rotation.

motivate[] the employer's decision." <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381, 396 (6th Cir. 2008).

The parties do not dispute that Berry, Fogle, and Clark fall within a protected class. However, Defendant contends that even if Berry, Fogle, and Clark were not permitted to operate the forklift, this would not constitute an adverse employment action. An "adverse employment action" is defined as a "materially adverse change in the terms and conditions of [plaintiff's] employment." <u>Momah v. Dominguez</u>, 239 F. App'x 114, 123 (6th Cir. 2007) (quoting <u>Hollins v. Atl. Co.</u>, 188 F.3d 652, 662 (6th Cir. 1999)) (internal quotation marks omitted). The change generally involves "a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." <u>Hollins</u>, 188 F.3d at 662. In this case, it is undisputed that driving the forklift does not offer additional economic benefits, but Plaintiffs have argued that operating the forklift is easier than other jobs on the bottling-line. Plaintiffs' subjective impression is insufficient to meet the "materially adverse" requirement; "[i]nstead, we employ an objective test that considers whether the employment action at issue was 'objectively intolerable to a reasonable person.'" <u>Momah</u>, 239 F. App'x at 124 (quoting <u>Policastro v. Northwest Airlines, Inc.</u>, 297 F.3d 535, 539 (6th Cir. 2002)).

In this case, it is clear that the forklift position required extra training to operate and that the Plaintiffs believed that the job was easier than other positions. While Plaintiffs almost exclusively advance their own testimony to demonstrate the relative ease of the forklift job over other bottling-line work, the Court finds significant the fact that other employees at Maker's Mark similarly sought forklift positions. Based on these two factors, Clark, Fogle, and Berry arguably faced circumstances "more disruptive than a mere inconvenience or an alteration of job

responsibilities." See Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 886 (6th Cir. 1996) (internal quotation marks and citation omitted). Therefore, the Court finds that Clark, Fogle, and Berry have sufficiently advanced enough evidence to raise a question of fact as to the existence of an adverse employment action.

Berry, Fogle, and Clark next contend that similarly-situated male employees were allowed to operate the forklift while they were denied the opportunity. As to Clark, there is no evidence that she was treated differently than any similarly-situated male employee, considering the rotation schedule included four women out of the total of six employees on the list. [Clark Dep., DN 47-1, at 9]. Clark alleges two other employees, David Mattingly and Marlana Allender, transferred to the bottling-line and started operating the forklift before her. Id. Even though one of the transfers involved a male, Clark admits that he had been working at Maker's Mark longer than her. Id. Due to Mattingly's seniority, he cannot be considered similarly situated. Homes-Naples v. Girard Bd. of Educ., 212 F. Supp. 2d 743, 750 (N.D. Ohio 2001) ("Federal courts have routinely held that employees are not similarly situated if they have differing amounts of seniority.") (citing Williams v. Widnall, 173 F.3d 431, 1999 WL 68574, *9 (6th Cir. 1999)). As a result, Clark fails to establish a prima facie case for gender discrimination based on the forklift rotation.

In terms of treatment of women on the forklift rotation, Fogle and Berry maintain that Miles would consistently skip over them when it was their turn to operate the forklift. Additionally, they argue that even when women drove the forklift, Miles and Mattingly would scream and harass the women on the forklift in order to get them off of it. In response, Defendant argues that "Plaintiffs Fogle and Berry both admit that they were given the same opportunity as their male counterparts to operate the forklift." [Reply, DN 55, at 12]. However,

the testimony identified by Defendant does not appear to support this statement. While Berry and Fogle acknowledged that they were initially allowed to operate the forklift during the weekly rotation, they both maintained that Miles eventually made it where only men used the forklift. [9] Similarly, Twyla Washington, a former bottling-line employee, and Wiser noted in their respective affidavits that they observed women not being given the same opportunity to operate the forklift as men in the bottling area. [10] Additionally, Defendant attempts to undermine Fogle and Berry's position by arguing that another female, Diane Rogers, constantly pushed women who operated the forklift. While this may be true, it does not detract from Fogle's and Berry's claim that they were skipped over on the rotation because they were women. Based on Plaintiffs' testimony concerning the forklift rotation, Fogle and Berry have sufficiently asserted enough facts to show that they were treated differently than similarly-situated males.

Because the Court finds that Berry and Fogle sufficiently established a prima facie case for gender discrimination based on the forklift rotation, Defendant must respond with a legitimate, nondiscriminatory reason for the adverse employment action. In this case, Defendant explains that the forklift position changed to a weekly rotation to improve efficiency and to address employee complaints. Defendant's legitimate, nondiscriminatory reason fails to adequately address the allegations that women were being skipped over on the weekly rotation.

---

[9] When asked about the forklift rotation in 2011, Fogle stated, "And you would ask Dale, Dale, it's my week, it's my turn to be in the rotation, and he would say, oh, I forgot, I'll get you next week." [Fogle Dep., DN 24-5, at 8]. She said that happened "ten or so times." Id. Similarly, Berry explained, "They -- they got to where they didn't want any of us on it. I would ask Dale Miles, you know, this is my week to do the forklift. Well, I'll get you next week. And, then, he would say it again next week. . . . Well, next week never came. Then, it got down to where there were no women; it was guys, and they treated them just fine. [Berry Dep., DN 24-2, at 11-12].

[10] When Wiser operated the forklift in the shipping and receiving area, he remembered that "more males than females operated the forklift machinery at Maker's Mark Plant in the bottling department." [Wiser Aff., DN 51-3, at 3]. Washington also noticed that "[t]here was a disparate forklift operation rotation between males and females, specifically forklift operation duties of most females were removed and given to males by Brian Mattingly and Dale Miles." [Washington Aff., DN 33-5, at 2].

As a result, Berry and Fogle may pursue a single-motive claim for sex discrimination based on the forklift rotation.

### 2. Mixed-Motive Discrimination

In addition to a single-motive case, Plaintiffs assert a mixed-motive claim for gender discrimination.[11] To establish a mixed-motive claim, a plaintiff must demonstrate: "1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action.'" White, 533 F.3d at 400 (quoting 42 U.S.C. § 2000e-2(m)). Defendant fails to respond to this theory. As a result, Berry, Fogle, and Clark may pursue a mixed-motive claim.

### 3. Fogle's Forklift Positions: Gender Discrimination

Fogle argues that Maker's Mark gave a part-time forklift position to David Wiser, an unqualified male employee, in 2011. Fogle believes that Maker's Mark circumvented the normal posting of positions in order to prevent her from bidding on the job. Defendant simply argues that Fogle received the only forklift job posted in 2011. Because there are not enough facts at this time to analyze this theory, the Court will not grant summary judgment for this claim. This also applies to Fogle's retaliation claim based on the same theory.

Next, Fogle appears to argue that Maker's Mark discriminated against her based on her gender by not creating a full-time forklift position. Fogle cannot maintain a claim for discrimination based on a theory that Maker's Mark should have created a full-time position instead of a part-time one. Maker's Mark was not required to create a full-time forklift position for Fogle simply because she wanted one. Therefore, this claim is dismissed. This also applies to Fogle's retaliation claim based on the same theory.

---

[11] It is a close call as to whether Plaintiffs adequately gave Defendant notice of their intent to pursue a mixed-motive case for gender discrimination. At the same time, the Sixth Circuit has articulated a fairly low standard for Plaintiffs in providing such notice. See, e.g., Spees v. James Marine, Inc., 617 F.3d 380, 390 (6th Cir. 2010).

### 4. Guard and Distillery Positions: Gender Discrimination

Clark alleged in her complaint that Maker's Mark did not hire her for one of the four full-time positions posted in October 2011 because of her gender. [Compl., DN 1, at 10, ¶ 31].  Clark failed to provide any evidence as to this claim or even offer an argument within her response to Defendant's summary judgment motion.  As to the distillery positions, Clark cannot show that she was treated differently than similarly-situated males because Defendant hired two females, Roxanne Norris and Angle Berry.  Assuming that the two males Maker's Mark hired for the guard position would be considered similarly situated, Clark does not advance arguments as to how Defendant's reasons for hiring the two men shows pretext for discrimination.  Specifically, Maker's Mark contends that it hired the two males because they expressed interest in the positions while Clark only sought the distillery positions.  Therefore, Clark may not pursue a gender discrimination claim under this theory.

### B. Hostile Work Environment

Plaintiffs allege hostile work environment claims in violation of both Title VII and the Kentucky Civil Rights Act ("KCRA"). Under KCRA, it is unlawful for an employer

> [t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, sex[.]

K.R.S. § 344.040(1)(a). "[A] sexual harassment claim brought under KCRA is to be analyzed in the same manner as a claim brought under Title VII. Ammerman v. Board of Educ. of Nicholas Cnty., 30 S.W.3d 793, 797–98 (Ky. 2000).  To establish a prima facie case for sexual harassment, a plaintiff must demonstrate: "(1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment created a hostile work environment, and that (5) the employer is vicariously liable."

Clark v. United Postal Service, Inc., 400 F.3d 341, 347 (6th Cir. 2005) (quoting Williams v. Gen. Motors Corp., 187 F.3d 553, 560-61 (6th Cir. 1999)).[12] "For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive." See, e.g., Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 754 (1998).

### 1. Co-Worker Harassment

Defendant contends that Plaintiffs cannot establish that the harassment by Duvall, Nally, and Hagan was based on their sex. In a same-sex harassment case, a plaintiff may establish the third element of a prima facie case in three ways: "(1) where the harasser making sexual advances is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of [wo]men in the workplace; and (3) where the plaintiff offers 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" Vickers v. Fairfield Medical Center, 453 F.3d 757, 765 (6th Cir. 2006) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80-81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998) (internal quotation marks and citation omitted). Plaintiffs assert that evidence supports the claim that Hagan made sexual advances towards them and that their harassers treated men and women differently in the workplace.

---

[12] Plaintiffs also pleaded a mixed-motive theory under their hostile work environment claim, but this does not exist. Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1326 (8th Cir. 1994) ("The mixed-motives analysis is inapplicable to a hostile-work-environment claim . . . . [because] [a]n employer could never have a legitimate reason for creating a hostile work environment.")

Plaintiffs maintain that Hagan acted out of sexual desire when she touched coworkers' butts, including Clark's. According to Clark, this touching occurred only once, but Clark believed that Hagan meant the touching in a sexual way. Also, Berry testified that Hagan hugged her, which she believed was meant to be sexual. Other than Berry's and Clark's conclusory opinions, the Court finds little evidence to support the assertion that Hagan acted out of sexual desire in these instances. "In order to survive summary judgment, Plaintiff cannot rely on conjecture or conclusory accusations." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008) (citation omitted). In contrast, the Court finds substantial evidence that Hagan did not act out of sexual desire. First, Thompson and Mills indicated that they did not believe that Hagan's touching related to sexual desire. [Thompson Dep., DN 24-8, at 19; Mills Dep., DN 24-7, at 17]. Second, Hagan was married and there was no evidence that she sexually sought out members of the opposite sex in the workplace. Finally, the hug and the one touching of Clark were not accompanied by a statement evidencing sexual desire or an additional sexual act. Hagan appears to have engaged in inappropriate horseplay, not sexually motivated conduct.

Plaintiffs next contend that Hagan, Duvall, and Nally only made their sexually explicit comments to their female co-workers. As for Duvall, she admitted that David Wiser and Desmond Spalding were around when she would make inappropriate comments about her sex life. [Duvall Dep., DN 53-2, at 15]. Clark also confirmed Desmond Spalding's presence during Duvall's offensive comments. [Clark Dep., DN 47-1, at 12]. Similarly, Angel Berry recounted a couple of instances in which Nally made sexual statements specifically directed towards Jimmy Morris. [Angel Berry Dep., DN 37-1, at 6].[13] Plaintiff Berry even testified that Dale Miles witnessed Hagan expose herself. [Berry Dep., DN 49-1, at 19]. While the Court acknowledges

---

[13] Plaintiffs, in listing the instances of vulgar behavior in their respective briefs, actually all included the example of Nally making comments to Morris. [Clark Mem., DN 36, at 23; Mills Mem., DN 34, at 22; Thompson Mem., DN 33, at 21; Fogle Mem., DN 35, at 23; Berry Mem., DN 51, at 20].

that mostly females witnessed the alleged vulgar behavior, this appears to be a product of the fact that the majority of the bottling-line employees were female. Evidence supports the fact that if more men had been present in the bottling area,[14] they would have been equally as exposed. "[I]t is established in the Sixth Circuit that the Court will not find grounds for an actionable gender discrimination claim when no cause of action would have existed if Defendant had been an 'equal opportunity' harasser." Lavack v. Owen's World Wide Enterprise Network, Inc., 409 F. Supp. 2d 848, 854 (E.D. Mich. 2005) (citing EEOC v. Harbert–Yeargin, Inc., 266 F.3d 498, 520 (6th Cir. 2001)). Therefore, Plaintiffs fail to demonstrate that the alleged sexual harassment resulted due to Plaintiffs' sex, and their hostile work environment claim is dismissed.

### 2. Fogle's Time-Barred Claim

Fogle also claims to have been subjected to sexual harassment by Teddy LLassos in 2004. Defendant argues that this claim is time-barred under KCRA and Title VII. There is no evidence of a timely filing to the EEOC or a similar action at the state level. 42 U.S.C. § 2000e-5(e)(1) (requiring parties to file a charge of unlawful employment practices be filed within three hundred days following the alleged behavior); Talley v. Weyerhaeuser Co., CIV.A. 1:07-CV-143, 2007 WL 4365401 (W.D. Ky. Dec. 12, 2007) ("Courts have unanimously held that actions brought pursuant to KCRA are governed by the five-year statute of limitations set forth in K.R.S. § 413.120(2) for actions based upon liability created by statute."). Fogle fails to address Defendant's contention that this claim is time-barred, and therefore, this claim must be dismissed.

---

[14] Berry described a situation in which Kim Hagan allegedly removed her shirt and yelled for Roger Hagan. [Berry Dep., DN 49-1, at 19]. Although Roger Hagan did not see her due to the fact that he was occupied driving the forklift, this behavior suggests that Kim Hagan behaved similarly in front of both women and men.

### C. Retaliation

In order for a plaintiff to establish a prima facie case for retaliation, she faces the initial burden of showing that:

> (1) the plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the employee or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

Fuhr v. Hazel Park School Dist., 710 F.3d 668, 674 (6th Cir. 2013) (citation omitted). It should be noted that "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 523 (6th Cir. 2008) (internal quotation marks and citation omitted). However, unlike other Title VII claims, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the employer carries that burden, "the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." Fuhr, 710 F.3d at 675 (citing Abbott v. Crown Motor Co., 348 F.3d 537, 542 (6th Cir. 2003)).

### 1. Berry's Termination and the Oliver Group Survey

Berry alleges that Maker's Mark retaliated against her after she submitted the Oliver Group survey and informed Johnsen about the harassment and disparate treatment she experienced in the bottling-line area. Defendant does not dispute the existence of an adverse employment action since Maker's Mark terminated Berry. Instead, Defendant argues that it

lacked knowledge that Berry engaged in a protected activity prior to terminating her. Additionally, Defendant contends that even if Berry could establish a prima facie case for retaliation, she cannot demonstrate pretext because Maker's Mark conducted an investigation and acted in an honest belief when it terminated her.

"[I]t is fairly clear from Sixth Circuit case law that employer knowledge of a plaintiff's protected activity is required." Scott v. Eastman Chemical Co., 275 F. App'x 466, 482 (6th Cir. 2008). While at times courts have simply incorporated the element of employer knowledge into the analysis of a causal connection, the fact remains that Berry must establish knowledge to advance a prima facie case. Id. ("[O]ne cannot retaliate against an employee for engaging in protected activity unless he knew the employee had done so."). "Knowledge may be inferred from evidence in the record." Id. (citation omitted). As to the surveys, Berry states that she made comments on the survey to indicate that Maker's Mark engaged in unlawful behavior and that the Oliver Group provided Defendant with this feedback. However, not only were the surveys anonymous but the Oliver Group did not provide copies of the surveys to Maker's Mark. [Lucey Dep., DN 24-11, at 9]. More importantly, Berry does not offer any evidence to show that Maker's Mark was actually made aware of these statements related to unlawful activity. Without this connection, Berry cannot maintain that Defendants had knowledge of protected activity, regardless of what Berry indicated on their surveys.

Next, Berry argues that Maker's Mark knew of her opposition to unlawful conduct following the two-day discussions with Johnsen. While Berry asserts multiple theories to sustain an inference of employer knowledge, the most compelling facts derive from the email sent from Johnsen to Lucey. First, the email strongly suggests that employees made Johnsen aware of unlawful behavior in the bottling area. Specifically, the email indicated that Hagan was

harassing people in the bottling area and employees were using "cuss words" at work.  Second, the email also stated that "Mr. Miles should stop asking employees what was said during the initial meeting about the employee survey[.]" [April 5, 2011 Email, DN 24-14, at 4].  While this appears to be a close call, Johnsen's statements in the email combined with Plaintiffs' testimony in which they said that they informed Johnsen about unlawful behavior are enough to create an inference that both Lucey and Miles knew of Berry's protected activity.

In order to establish the causal connection element, Berry relies solely upon the timing of her termination, which occurred almost a week after the email from Johnsen to Lucey. Defendant completely fails to respond to Berry's argument as to the causal connection. "Proof of temporal proximity between the protected activity and the adverse employment action, 'coupled with other indicia of retaliatory conduct,' may give rise to a finding of a causal connection." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007) (quoting Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 737 (6th Cir. 2006)).  However, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 525 (6th Cir. 2008).  Considering the extremely short proximity between complaints of unlawful conduct to Johnsen and Berry's termination, the Court finds sufficient factual support for a causal connection.

Following the establishment of a prima facie case, Defendant must assert a legitimate, nondiscriminatory reason for terminating Berry.  Here, Defendant argues that it terminated Berry for performing a suggestive dance and for exposing her breasts at work.  Because Defendant offered a reason for terminating Berry, she must demonstrate that the stated reason is pretext for

retaliation. She may establish pretext by showing: "(1) that the proffered reasons had no basis *in fact;* (2) that the proffered reasons did not *actually* motivate [her] discharge; or (3) that they were *insufficient* to motivate discharge." <u>Russell v. Univ. of Toledo</u>, 537 F.3d 596, 604 (6th Cir. 2008) (citation omitted). Berry relies upon the first and third methods of showing pretext to refute Defendant's reason for terminating her.

Berry first disputes Defendant's factual findings that she performed a suggestive dance and exposed her breasts. In doing so, she produces witnesses that contradict what other individuals told Maker's Mark when they interviewed people concerning the incidents. Specifically, Berry relies upon affidavits submitted by Wiser and Mary Lou Spalding who both stated that they neither observed Berry perform a lap dance nor expose her breasts at work. By presenting these statements, Berry raises a question of fact as to whether the alleged conduct actually occurred. <u>Rutherford v. Britthaven, Inc.</u>, 452 F. App'x 667, 672 (6th Cir. 2011) ("A reason has "no basis in fact" when it is 'factually false.'") (citation omitted).

Defendant argues that it honestly believed that Berry engaged in inappropriate behavior based upon the interviews conducted with bottling-line employees. A defendant may articulate a theory under the honest-belief rule after a plaintiff provides evidence that defendant's legitimate, nondiscriminatory reason for taking an adverse employment action is pretextual. <u>Clay v. United Parcel Service, Inc.</u>, 501 F.3d 695, 714 (6th Cir. 2007). "One way in which a plaintiff may demonstrate pretext is by showing that the reason given by the employer 'is ultimately found to be mistaken, foolish, trivial, or baseless.'" <u>Id</u>. (quoting <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 806 (6th Cir. 1998). The honest-belief rule allows an employer another chance to demonstrate that the adverse employment action is not the result of discriminatory intent. <u>Id</u>. at 714-15. The employer can establish "honest belief" by showing its "reasonable reliance on the particularized

facts that were before it at the time the decision was made." <u>Haughton v. Orchid Automation</u>, 206 F. App'x 524, 532 (6th Cir. 2006) (quoting <u>Smith</u>, 155 F.3d at 807).

In response to Defendant's reliance on the honest belief rule, Berry argues that Maker's Mark insufficiently investigated the matter because it did not interview enough employees. However, "[w]e have not required that the employer's decision-making process under scrutiny 'be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" <u>Seeger v. Cincinnati Bell Telephone Co., LLC</u>, 681 F.3d 274, 285 (6th Cir. 2012) (quoting <u>Smith</u>, 155 F.3d at 807). If Maker's Mark had simply ended its investigation after talking to Nally, Hagan, and Duvall, the discussion into the thoroughness of Defendant's investigation would possibly be different, but that was not the case here. Defendant clearly interviewed both interested and uninterested parties when it conducted its investigation, and therefore, there is no reason for the Court to further scrutinize the process. Additionally, even taking into account Spalding's and Wiser's affidavits, they do little to contradict the numerous witnesses who confirmed that Berry engaged in inappropriate behavior. <u>Braithwaite</u>, 258 F.3d at 495-96 (concluding that employer did not fail to fully investigate allegations of misconduct that resulted in an adverse employment action where one witness contradicted the statements of three witnesses in which employer based its decision). Thus, no rational jury could conclude that Defendant failed to act under an honest belief in terminating Berry. <u>Mickey</u>, 516 F.3d at 526 ("The plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action.") (internal quotations and citation omitted).

Next, Berry attempts to demonstrate pretext by showing that Defendant's stated reasons were insufficient to actually motivate her termination. In order to do so, she "must show by a preponderance of the evidence that other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [Berry]." Blizzard v. Marion Technical College, 698 F.3d 275, 286-87 (6th Cir. 2012) (internal quotation marks and citation omitted). As to the suggestive dance, Berry argues that Defendant did not fire Wiser for participating in the alleged dance. However, the allegations as to Wiser were limited to his involvement in the suggestive dance. On the other hand, Berry was not only accused of performing a dance but also exposing her breasts while at work. Therefore, Wiser cannot be considered "substantially identical." Braithwaite v. Timken Co., 258 F.3d 488, 497 (6th Cir. 2001) (noting that employees who were accused of breaking only one rule were not similarly situated as the plaintiff who was accused of breaking two rules).

Based on the pretext analysis, the Court must grant summary judgment in favor of Defendant as to Berry's retaliation claim related to her termination.

### 2. Separation of Bottling-Lines

Fogle, Clark, Thompson, and Mills also allege Maker's Mark retaliated against them by splitting the bottling-line groups, Line A and B, into two rooms. According to Mattingly, Maker's Mark moved the two lines during the first week of April. [Mattingly Dep., DN 24-10, at 11]. As previously discussed in Berry's retaliation claim, it can reasonably be inferred that Maker's Mark had knowledge of Plaintiffs' opposition to unlawful conduct based upon the meetings with Johnsen and the email sent from Johnsen to Lucey. However, even though Defendant had sufficient knowledge of Plaintiffs' protected activity, Plaintiffs fail to demonstrate

how the separation of the bottling-lines constitutes an adverse employment action. The fact that the two lines were placed in two different rooms and that the employees did not rotate between the lines appears to be *de mininis* in nature. More importantly, all employees on the bottling-line experienced this change, not just Plaintiffs. As a result, Plaintiffs cannot base a claim for retaliation for the change to the bottling-line arrangement.

### 3. Clark's May 5, 2011 Reprimand

Clark alleges that Maker's Mark retaliated against her the day after she submitted her complaint to MacRae-Samuels. [Compl. DN 1, at 8-9]. According to Clark, Lucey called her into her office and informed Clark that she was being reprimanded for not performing her job. [Clark Dep., DN 47-1, at 16]. When asked what the conversation was with Lucey, Clark sated as follows:

> The only thing I remember was that I was accused of not doing my job. I wanted to see Dale. So I don't know – [Lucey] didn't tell me who said it or what I refused to do, and, the, asked me to sign a paper, and I refused to sign that piece of paper.

Id. Defendant does not address Clark's claim, and therefore, the Court will not address this argument at this time.

### 4. "No Retaliation" Notices

Fogle, Mills, Thompson, and Clark allege Defendant retaliated against them after they submitted complaints to MacRae-Samuels concerning vulgar behavior from Nally, Hagan, and Duvall. Specifically, Plaintiffs (except Berry) assert that they were retaliated against when they received "No Retaliation" Notices instructing them not to retaliate against their co-workers. In response, Defendant maintains that these "No Retaliation" Notices do not qualify as an adverse employment action.

For the purposes of Title VII, an "adverse employment action" is a "materially adverse change in the terms or conditions of employment because of the employer's actions." <u>Steward v. New Chrysler</u>, 415 F. App'x 632, 640 (6th Cir. 2011) (citing <u>Michael v. Caterpillar Fin. Servs. Corp.</u>, 496 F.3d 584, 593 (6th Cir. 2007)). However, the task of establishing that the employer took an adverse employment action for a retaliation claim is "less onerous" than doing so in the discrimination framework. <u>Michael v. Caterpillar Financial Services Corp.</u>, 496 F.3d 584, 595 (6th Cir. 2007) (citing <u>Burlington Northern</u>, 548 U.S. at 68). In a retaliation claim, an adverse employment action "consists of any action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Michael</u>, 496 F.3d at 596 (quoting <u>Burlington Northern</u>, 548 U.S. at 68). "This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." <u>Id</u>.

Fogle, Mills, Thompson, and Clark compare the "No Retaliation" Notices and the meetings with the 90-day performance plan found in <u>Michael</u>. The performance plan in <u>Michael</u> mostly required the plaintiff "to refrain from engaging in certain unreasonable practices, such as treating her subordinates like personal assistants, calling them at home outside of normal business hours, and failing to notify her supervisors when she would be out of the office for the day." <u>Michael</u>, 496 F.3d at 595. Noting the "low bar" in retaliation cases, the Sixth Circuit found that the 90-day performance plan constituted an adverse employment action. Defendant contends the meetings with Fogle, Mills, and Thompson, and Clark cannot be considered an adverse employment action because the meetings were not disciplinary in nature.

Undoubtedly, the string of complaints from the two conflicting groups[15] of bottling-line employees placed Maker's Mark in a precarious situation as to how to remedy the situation and not retaliate in the process.[16] If Defendant had placed Fogle, Clark, Thompson, and Mills on a performance plan, the issue of whether Maker's Mark took an adverse employment action would be a closer question. However, Plaintiffs' (except Berry) claim involves a notice accompanied by two meetings held on May 12 and May 13, 2011 (except for Clark who only had a meeting on May 12). Even if the Court were convinced that the notices were disciplinary in nature, a reprimand does not constitute an adverse employment action "without evidence that it led to a materially adverse consequence such as lowered pay, demotion, suspension, or the like . . . ." Creggett v. Jefferson County Bd. of Educ., 491 F. App'x 561, 566 (6th Cir. 2012) (citation omitted). There is no evidence that the notices had more than a *de minimis* impact on Fogle, Clark, Mills, and Thompson. Bowman v. Shawnee State University, 220 F.3d 456, 462 (6th Cir. 2000) ("The Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable."). Moreover, two meetings and a notice concerning retaliation would not dissuade a reasonable employee from pursuing a charge of discrimination. Taylor v. Geithner, 703 F.3d 328, 338 (6th Cir. 2013) (rejecting that an adverse employment action existed where plaintiff failed to show a disciplinary action took place or that the reprimand "related to a larger pattern of intimidation by constantly reprimanding [plaintiff]"). Therefore, Fogle, Clark, Mills, and Thompson cannot establish a prima facie case for retaliation based on the "No Retaliation" Notices.

---

[15] The EEOC investigation similarly noted, "Information provided by Respondent has shown that the Charging Parties and another set of female co-workers have engaged in inappropriate behavior in the workplace toward one another and that multiple complaints from both sets of employees have been investigated by management." [Fogle Dep., DN 24-6, at 20].

[16] If Defendant failed to investigate claims of retaliation made by Nally and Duvall, it could have been potentially liable to them. Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 347 (6th Cir. 2008) (extending liability for co-worker retaliation where the employer knew or should have known of such conduct but failed to remedy it).

### 5. Guard and Distillery Positions: Retaliation

Clark asserts a retaliation claim for not being hired for the two distillery positions and two guard positions in October of 2011. Again, Clark fails to refute Defendant's argument within her responsive briefing. Even if Clark addressed the merits to this claim, she cannot establish a causal connection between her not being hired for these positions and participation in a protected activity. Due to the fact that Clark filed her first discrimination claim with the EEOC on May 16, 2011, she may not solely rely on temporal proximity to demonstrate a causal connection. Nicholson v. City of Clarksville, Tenn., 530 F. App'x 434, 448 (6th Cir. 2013) (citing Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986)) ("A time period greater than six months, without more, is not a sufficiently short period of time to satisfy the causal connection element of a retaliation claim."). Clark has failed to provide additional evidence to suggest a causal connection, and thus, she may not maintain a retaliation claim on this theory.

### 6. Fogle's Retaliation Claims Based on Forklift Positions and Rotation

Fogle alleges in her responsive motion that "Desmond Spalding [] wrecked the forklift, but Ms. Fogle was blamed for the damages, and asked to retrain and retake a drug test. Although, Mr. Spalding eventually received punishment for the forklift wreck it was days after Ms. Fogle was given the initial blame." [Pl. Fogle's Mem., DN 35, at 18]. Fogle's assertion in her responsive motion is misleading as revealed by her deposition testimony.

> A. It's-- on this particular photograph, Desmond had wrecked the forklift, and I had wrecked the forklift prior to that picture, and I was suspended and made to retrain and take a drug test, and Desmond stayed on the forklift. And, then, several days later he was suspended, as well, and given a drug test.
>
> Q. But you ran over somebody's foot, didn't you?
>
> A. No. What happened was I was stopped, and I was going to go forward and put a pallet up into what we call a magazine, and I'm stopped, looking forward, and I

had asked the person that was up on "Depal" if she was putting the boxes on backwards. She said no. I let my foot off the gas, and an employee had tried to squeeze behind me in between my; forklift and a pallet, and I had no idea she was back there.

Q. But she was injured?

A. She had stuck her-- I believe it was her left foot -- she had stuck one of her feet under -- when she was coming around the edge trying to squeeze between me and a pallet, she stuck her foot underneath the back wheel.

[Fogle Dep., DN 44-1, at 16]. Fogle's testimony shows that not only did she damage the forklift but also she injured a fellow co-worker during the operation of the forklift. It is unclear when this particular incident actually occurred. However, assuming this occurred after the filing a complaint in opposition, she does not even refute Defendant's legitimate, nondiscriminatory reason. In fact, she admits to injuring a fellow co-worker and damaging the forklift.

Defendant also moves to dismiss Fogle's claim based on her May 4, 2012 write-up related to her performance. Fogle's testimony shows that she does not believe her reprimand was related to retaliation. Moreover, Fogle does not dispute Defendant's argument.

Finally, Fogle asserts that Miles skipped her on the forklift rotation as a form of retaliation on April 27, 2011—three days after the filing of her complaint. [Compl., DN 1, at 14]. Defendant does not address this allegation, and therefore, the Court will not dismiss this claim at this time.

### D. Family Medical Leave Act (FMLA)

The Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, entitles qualifying employees up to twelve weeks of unpaid leave each year "to care for a spouse, child, or parent with a 'serious health condition' or if the employee has a 'serious health condition' that renders the employee unable to perform the functions of his job." <u>Payne v. Goodman Mfg. Co., L.P.</u>, 726 F.Supp.2d 891, 898 (E.D. Tenn. 2010) (citing 29 U.S.C. § 2612(a)(1)(C)-(D)). A "serious

health condition" is a condition that requires inpatient care or continuing treatment by a health care provider. 29 U.S.C. § 2611(11). "To invoke the protections of the FMLA, an employee must give his employer adequate notice and a qualifying reason for requesting FMLA leave." Payne, 726 F.Supp.2d at 898 (citing Hoge v. Honda of Am. Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004)). It is unlawful for employers to either interfere with the rights afforded employees by the FMLA or retaliate against employees for exercising their FMLA rights. 29 U.S.C. § 2615(a). The Sixth Circuit recognizes two distinct theories for recovery under the FMLA: "(1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." Hoge, 384 F.3d at 244. The Sixth Circuit applies the Title VII burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973), to both FMLA interference and retaliation claims where, as here, there is no direct evidence of unlawful conduct. Donald v. Sybra, Inc., 667 F.3d 757, 762 (6th Cir. 2012); Jaszczyszyn v. Advantage Health Physician Network, 2012 WL 5416616, *7 (6th Cir. Nov. 7, 2012). Thus, if a plaintiff satisfies the prima facie case as to either an interference or retaliation claim under the FMLA, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. Gates v. U.S. Postal Service, 2012 WL 4902851, *4 (6th Cir. Oct. 16, 2012). If the defendant articulates such a reason, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the proffered reason is pretextual. Id. Fogle filed suit under both theories.

### 1. Interference

"Interference" or "entitlement" claims arise under 29 U.S.C. § 2615(a)(1), which provides, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." To establish a prima facie case for an interference claim, an employee must prove that: (1) she was an eligible

employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. See Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005) (citing Cavin, 346 F.3d at 719). "Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm." Edgar v. JAC Products, Inc., 443 F .3d 501, 508 (6th Cir. 2006) (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) ("[Section] 2617 provides no relief unless the employee has been prejudiced by the violation . . . .")). Defendant claims that Fogle cannot meet the fifth element of the prima facie case.

Defendant contends that Fogle fails to demonstrate that it denied her twelve weeks of FMLA leave. Based on Fogle's responsive motion, the Court is puzzled as to her position on the interference claim. However, Fogle does not assert any facts to suggest that Maker's Mark prevented her from using her FMLA leave. In fact, it appears as though Fogle was able to exhaust all of her permitted FMLA leave. Therefore, Fogle's interference claim is dismissed

### 2. Retaliation

Fogle argues that the Defendant retaliated against her for exercising her FMLA rights in violation of 29 U.S.C. § 2615(a)(2). "The issue in an FMLA retaliation claim is whether an employer retaliated or discriminated against an employee because the employee invoked her FMLA rights." Brady v. Potter, 476 F.Supp.2d 745, 758 (N.D. Ohio 2007). "To establish an initial prima facie case of retaliation, a plaintiff must show the following by a preponderance of the evidence: '(1) [she] engaged in an activity protected by the [FMLA]; (2) that this exercise of [her] protected rights was known to the defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.'" Morris v. Family Dollar Stores of

Ohio, Inc., 320 Fed. Appx. 330, 338 (6th Cir. 2009) (quoting Arban, 345 F.3d at 404). Defendant claims that Fogle does not demonstrate that its legitimate, nondiscriminatory reason for moving her to the bottling-room was pretextual.

Fogle maintains that Maker's Mark retaliated against her by transferring her from a part-time forklift position in shipping to a part-time position on the bottling-line following the exhaustion of her FMLA leave. According to Fogle, her FMLA leave extended until February 16, 2012, but Maker's Mark did not have her start work again until February 21. In contrast, Maker's Mark argues that Fogle's FMLA leave actually ended on January 2. Additionally, Defendant contends that it decided to move Fogle to the bottling-line due to the fact that she had multiple unexcused absences both before and after taking her FMLA leave.

As to the extent of the Fogle's FMLA leave, the Court is left perplexed as to the large discrepancy between the parties' positions as to when Fogle's leave ended. Fogle relies on her deposition testimony to support her position while Defendant supplies an affidavit from Lucey for its position. However, assuming that Fogle's FMLA leave continued into February, she still would not be able to demonstrate that Defendant's legitimate, nondiscriminatory reason was pretext for her transfer. Fogle could solely rely upon temporal proximity to establish a causal connection for a prima facie case, but this would be insufficient to demonstrate pretext. Krumheuer v. GAB Robins North America, Inc., 484 F. App'x 1, 5 (6th Cir. 2012) (quoting Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317 (6th Cir. 2001) ("[W]e have also stated that 'temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.'" ). Fogle attempts to argue that Lisa Humphrey ("Humphrey"), a co-worker, was absent the same amount of time and yet, she was promoted. First, the Court fails to see any connection between Humphrey

moving from part-time to full-time and Fogle's FMLA claim. Second, Fogle does not attempt to provide any evidence, other than her testimony, that Humphrey missed the same number of days as her. There is no reason for the Court to believe that Humphrey was similarly-situated to Fogle. As such, Fogle's claim for FMLA retaliation must be dismissed.

### E. Religious Discrimination

Under Title VII, a party may bring two types of religious discrimination claims: a disparate treatment claim and a religious accommodation claim. Reed v. International Union, United Auto., Aerospace and Agr. Implement Workers of America, 569 F.3d 576, 579 (6th Cir. 2009). Plaintiffs in this case assert a claim only under a disparate treatment theory. "A plaintiff must either present direct evidence of discrimination or, in the absence of direct evidence, present a prima facie case of indirect discrimination." Tepper v. Potter, 505 F.3d 508, 515 (6th Cir. 2007). In order to establish a prima facie case for indirect religious discrimination claim based on disparate treatment, a plaintiff must prove the following:

> (1) She was a member of a protected class; (2) that she was qualified to continue her job; (3) that she was subjected to an adverse action by her employer; and (4) for the same or similar conduct, she was treated differently than similarly-situated non-protected employees.

Gibson v. Finish Line, Inc. of Delaware, 261 F. Supp. 2d 785, 791 (W.D. Ky. 2003) (citing Perry v. McGinnis, 209 F.3d 597, 601 (6th Cir. 2000)). Then, "the defendant must articulate a legitimate nondiscriminatory reason for the plaintiff's termination. If the defendant can do so, the burden shifts back to the plaintiff to prove that the articulated reason was merely a pretext for the real reason, unlawful discrimination." Hall v. Baptist Memorial Health Care Corp., 215 F.3d 618, 626 (6th Cir. 2000) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

In this case, the parties mainly dispute the existence of a similarly-situated non-protected employee. Mills, Fogle, Clark and Thompson[17] maintain that Supervisor Brian Mattingly treated Humphrey better than them because of Humphrey's association with New Beginning's Church, which Mattingly attends. First, it is highly questionable if Humphrey has ever attended New Beginnings Church since she specifically disclaimed such in an affidavit. [Humphrey Aff., DN 55-1, at 2]. Second, Thompson, Mills, Fogle, and Clark simply argue that Humphrey was treated better in terms of her use of sick time and personal leave, but they fail to provide a single piece of evidence to support that proposition.[18] Therefore, Plaintiffs fail to establish a prima facie case based on the treatment of Humphrey.

Plaintiffs also pleaded a case for religious discrimination based on the promotions of Kim Hagan and Cheryl Medley to lead positions on the bottling-line. Specifically, Plaintiffs assert that these individuals were promoted due their association with New Beginnings Church. Defendant presented arguments as to why Plaintiffs fail to establish a prima facie case for religious discrimination based on Hagan and Medley, but Plaintiffs do not respond to any of these arguments. Therefore, the Court must assume that Plaintiffs have abandoned this theory and will dismiss their claims accordingly. Brown v. VHS of Michigan, Inc., 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). Plaintiffs' claims for religious discrimination are dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Exceed Page Limitations [DN 54] is **GRANTED**.

---

[17] Berry did not offer any response to Defendant's argument for dismissing the religious discrimination claim.
[18] Clark, Fogle, Thompson, and Mills submitted almost identical responses (except for name changes) to Defendant's argument for dismissing the religious discrimination claims.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [DN 24] is **GRANTED in part** and **DENIED in part**. It is **DENIED** as to Fogle's and Berry's single-motive gender discrimination claims based on the forklift rotation; Clark's, Fogle's, and Berry's mixed-motive claims for gender discrimination based on the forklift rotation; Fogle's retaliation and gender discrimination claims related to being denied the opportunity to obtain a forklift position in shipping; Clark's retaliation claim for her reprimand on May 5, 2011; and Fogle's retaliation claim for being skipped over on the forklift rotation on April 27, 2011. It is **GRANTED** to all other claims.

Joseph H. McKinley, Jr.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

April 30, 2014

cc: counsel of record